856 F.Supp. 837 (1994)
In re CONSOLIDATED WELFARE FUND ERISA LITIGATION.
Dewayne A. BAILEY, et al., Plaintiffs,
v.
EMPIRE BLUE CROSS/BLUE SHIELD, et al., Defendants.
MDL No. 902. No. 93 Civ. 6179 (MP).
United States District Court, S.D. New York.
July 12, 1994.
*838 Robert Brace, Hollister & Brace, Santa Barbara, CA, for plaintiffs.
Thomas R. Manisero, Wilson Elser Moskowitz Edelman & Dicker, New York City, for defendant CareAmerica, Inc.
Alan Unger, Sidley & Austin, New York City, for defendant Preferred Health Network, Inc.

DECISION AND OPINION
MILTON POLLACK, Senior District Judge:

Overview
Plaintiffs bring suit against numerous defendants for damages deriving from an alleged health insurance fraud perpetrated by a fraudulent union which purported to offer health insurance that was placed with unlicensed offshore insurance carriers. Two moving defendants whose sole function was to "precertify" insureds for proposed medical treatments move for summary judgment pursuant to Fed.R.Civ.P. 56, dismissing plaintiffs' claims which seek to draw them into the circle of liability by charges of negligence, negligence per se, and aiding and abetting fraud and breach of fiduciary duty. Plaintiffs allege that the two precertifier defendants (i) were negligent in failing to investigate the status of the insurers, with whom the Union placed the insurance; (ii) were negligent per se for transacting business with unlicensed insurers, a violation of the California Insurance Code; and (iii) aided and abetted the perpetrators of the fraud, lending legitimacy to the scam by precertifying insureds. Movants contend that (i) given their limited function, they do not bear a duty to plaintiffs to investigate or evaluate insurers; (ii) the California statute barring "transacting insurance" with unlicensed insurers is inapplicable to defendants; and (iii) defendants cannot be liable as aiders and abettors because plaintiffs concede defendants lacked actual knowledge of any underlying fraud. As a matter of law, the moving parties' motions for summary judgment will be granted.

I. Background
This case concerns an alleged pyramid-scheme health insurance fraud perpetrated upon vulnerable individuals who were "uninsurable" due to pre-existing medical conditions.
The scheme complained of, as explained by plaintiffs' counsel, is as follows. In 1989, one William Loeb, founded a sham union, Consolidated Union Local 867 (the "Union"). The Union was created and existed solely to market health insurance in part to individuals with pre-existing medical conditions. All those who sought to purchase health insurance through the Union's Welfare Fund were enrolled as "members" of the Union. These "members" generally paid their premiums to so-called "labor relations consultants" (at least one of whom was a Union Plan fiduciary), who deducted a percentage of the premiums as commissions and remitted the remainder to the Union. Originally, the Union insured its members through a group plan with Empire Blue Cross/Blue Shield ("Empire"). Empire, through statutory discounts, was able to insure New York state residents who had pre-existing illnesses. Loeb, however, sold the insurance to such people nationwide, and in short order reached some 10,000 people. For this reason among others, Empire terminated its agreement with the Union in 1990. At this point, many Union members terminated their insurance. The individuals who remained (many of whom were from California) were largely those who would have great difficulty obtaining health insurance anywhere due to their pre-existing medical conditions. These people were accustomed to paying their insurance premiums monthly upon receipt of an invoice, and continued to do so.
After Empire's withdrawal, a series of individuals and entities purported to replace the Empire insurance with insurance from *839 unlicensed off-shore carriers. The purported "insureds" were bounced, or "rolled over," from one unlicensed offshore insurance carrier to another. It is claimed by plaintiffs that in fact they were not insured, and that the offshore carriers were used simply to carry forward and conceal the scheme. While collecting premium checks (after deducting a string of commissions), the spurious "insurers" accumulated liabilities that inevitably would, and did in fact, exceed their assets. The scheme ultimately collapsed when it became evident that there was no viable insurance protecting the "beneficiaries." Plaintiffs contend that the victims of the scam have not been reimbursed for health care expenses, a sum in excess of $30 million, purportedly covered by the "insurance" they thought they had purchased.
Plaintiffs have brought suit against hundreds of defendants, including the unlicensed offshore insurance carriers and their principals and many of the insurance brokers through whom the plaintiffs had purchased the purported insurance. Plaintiffs' complaint alleges claims under RICO, ERISA and/or common law breach of fiduciary duty, fraud, negligence per se, negligence, and aiding and abetting.[1]

II. The Precertifiers
The defendants now moving for summary judgment, Preferred Health Network, Inc. ("PHN") and CareAmerica, Inc. ("CareAmerica"), are neither brokers nor agents. They neither sold nor placed insurance, nor did they have any connection with the premiums paid to buy insurance. Their sole connection to those involved in the instant litigation is that they both provided "precertification" services, whereby the appropriateness of proposed medical treatments of purported "insureds" was verified.
PHN is a managed care firm that operates "managed care services" programs to assist insurance companies and health care providers in making available cost-efficient health care services. The primary service provided by PHN is a provider network arrangement, whereby PHN essentially acts as a "middleman" to facilitate direct contracting between insurance companies (or "third-party administrators" on their behalf) on the one hand and the health care providers in the PHN network on the other. Use of the health care provider network reduces the costs of the health care services provided.
PHN also offers various administrative services to insurers and to health care providers, including so called "precertification" services used prior to hospital admissions to determine the appropriate location and estimates of the length of confinement and care prior to these services being rendered. Precertification, a common feature of many health insurance plans, is often a prerequisite to receiving medical treatment through a network of affiliated medical service providers. Medical necessity and appropriateness of treatment are determined by reference to a series of proprietary standards and other information developed by PHN, and by reference to widely-recognized protocols. A typical example of a precertification issue would be whether a recommended surgical procedure should be done in a hospital or on an out-patient basis, and if hospitalization is appropriate, what is the appropriate length of the hospital stay required. Mannheim Aff. at ¶ 10. In essence, precertification is a cost-reduction and fraud-prevention measure utilized by health insurance companies.
On September 1, 1990, PHN entered into a Payor Participation Agreement with defendant Benefit Data Administrators ("BDA"). At that time, BDA informed PHN that it was a third-party administrator and that it would like to make available PHN's network to insurance companies on whose behalf it provided administrative services. Pursuant to the BDA Agreement, PHN agreed to provide "precertification services" for the insurers. In consideration for performing this service, PHN was paid a fee of several dollars per insured processed. The BDA Agreement *840 made clear that PHN was not responsible for determining whether an insured would be eligible for payment of any insurance claim. Unger Aff. at Ex. A, §§ 2.6, 3.6. PHN contends, and plaintiffs concede, that at the time it entered the contract, and throughout its duration, PHN was unaware of any fraudulent or illegal conduct on the part of BDA or the insurers.
CareAmerica, a moving defendant herein, also provides precertification services to determine whether proposed medical services are necessary. CareAmerica is generally engaged by employers or third-party administrators to assist in identifying and reducing unnecessary medical services and thus contain health insurance costs. Through its staff of registered nurses and physicians, CareAmerica reviews the treatments proposed by a provider to determine whether said treatments are medically necessary, and advises the individual accordingly.
CareAmerica was engaged to perform its services on behalf of American Benefit Trust and American Business Benefit Trust (the "Trust"). CareAmerica entered into a contract, dated October 1, 1990, with the Trust to provide pre-surgical and pre-hospitalization admission review services for the Trust and its enrolled employers and their employees. CareAmerica was paid based upon the number of employees per month as well as an initial set-up fee of 25¢ per individual. As part of the agreement between CareAmerica and the Trust, CareAmerica would review proposed surgery and hospital admissions. Based upon the information presented, if those services were considered necessary and appropriate, CareAmerica so advised the individual. CareAmerica also advised each individual that the Trust retained authority of all claim determinations and that CareAmerica had not verified any individual insured's entitlement to insurance coverage. CareAmerica's contract with the Trust was terminated after 90 days.
In the course of providing their services, both PHN and CareAmerica have limited contact with insureds. Their contracts with insurers and network providers make clear that they are not obligated to certify to the insureds the existence or validity of insurance coverage or to guarantee payment of any claims. Issues concerning precertification are generally not discussed directly with the alleged insurer, but rather with the doctors and other health care providers involved in the medical treatment. Bills are transmitted from providers to insurers (after re-pricing at a discounted rate); the insureds are not involved in the billing process. In the event they are contacted by an insured, both PHN and CareAmerica instruct their employees not to discuss coverage or eligibility issues with the insured, but to refer the insured to his insurance company.
Both PHN and CareAmerica assert that at no time was either of them aware of any fraud or wrongdoing on the part of the alleged insurers. Plaintiffs do not dispute this assertion. Moreover, plaintiffs concede that the precertifiers did not guarantee coverage or the economic viability of the insurers. Plaintiffs concede that precertifiers simply analyze whether the insured's proposed treatments and anticipated time to be spent in the hospital are medically necessary. Plaintiffs' Br. at 2. Rather, the essence of plaintiffs' case against the moving defendants is that the "precertifications" furnished by PHN and CareAmerica constituted "implied representation[s] of the existence of real and legal insurance." Plaintiffs' Br. at 3. Plaintiffs contend that CareAmerica and PHN, at a minimum, guaranteed the existence of a "payor" and the non-criminality of the plan.
Plaintiffs contend that the acts of the PHN and CareAmerica in furnishing precertification services subjects them to liability for the unpaid claims. PHN and CareAmerica respond that all of plaintiffs' theories of liability are legally insufficient given the facts alleged and those conceded by plaintiffs. Summary judgment of dismissal is sought by these two defendants.[2]

*841 III. Analysis
Plaintiffs assert claims against PHN and CareAmerica under three legal theories of the law of California (the state where most of the plaintiffs reside): (1) negligence; (2) negligence per se; and (3) aiding and abetting breach of fiduciary duty. All three claims fail as a matter of law.

The Standard for Decision
Summary judgment is appropriately granted pursuant to Fed.R.Civ.P. 56 where there is no genuine issue of material fact as to any essential element of the claim, and when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).
When a motion for summary judgment is made, the non-moving party may not rely solely on the pleadings, but by affidavits, depositions, answers to interrogatories, and admissions must show that there are specific facts demonstrating that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The task for the court is not to resolve disputed issues of fact, but to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

The Negligence Claims
Plaintiffs assert that PHN and CareAmerica had a duty to avoid conduct that would foreseeably cause harm to plaintiffs, and that PHN and CareAmerica both breached this duty when they contracted with unlicensed insurers to precertify "insureds." Plaintiffs contend that it was foreseeable to both PHN and CareAmerica that non-admitted insurers could victimize the plaintiffs herein and precertification might assist in the execution of that fraud. Defendants respond that, as a matter of law, they did not owe a duty of care to plaintiffs to investigate the alleged insurance carriers. Defendants contend that the connection between PHN's and CareAmerica's "conduct" and plaintiffs' injuries is too remote to support a duty to plaintiffs to investigate the financial accountability of the insurance companies with whom they had precertification contracts.
The issue raised herein is whether defendants owed plaintiffs a duty of due care that would have required PHN and CareAmerica to undertake at least some cursory investigation of the companies for whom it was performing precertifications. The parties offer no precedent on the scope of the duties, if any, a precertifier owes to prospective insurance applicants. Nor has this court's own research revealed any precedent that would impose upon precertifiers a duty running to the claimants or prospective insurance applicants to investigate the status of the insurance carriers with whom the precertifiers contract.
It is clear that the precertifiers and plaintiffs did not share any sort of contractual relationship. In the absence of privity, the California Supreme Court has held: "The determination when in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors among which are the extent to which the transaction was intended to affect plaintiff, the foreseeability of harm to him, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." Biakanja v. Irving, 49 Cal.2d 647, 320 P.2d 16 (1958). Key among these factors in the instant case is the proximity of the connection between the precertifiers' conduct and the plaintiffs' injury. The connection between PHN's and CareAmerica's "conduct" and plaintiffs' injuries is simply too remote to support the imposition upon plaintiffs of a duty to investigate the financial status of the *842 insurance companies to whom the precertifiers submitted their evaluations. Notwithstanding plaintiffs' assertions to the contrary, it is not evident that the precertifiers' conduct was the cause in fact  let alone the "proximate cause"  of any loss incurred by the beneficiaries. Without more, plaintiffs' contentions that precertifiers' acts conferred a deceptive air of legitimacy to the situation cannot be the basis for the imposition of a duty to investigate the purported insurers or any other part of the fraudulent scheme.

The Negligence Per Se Claims
Plaintiffs contend that California statutes prohibit non-admitted insurance companies from issuing medical insurance to citizens of that state. Moreover, they contend that California Insurance Code § 1761 prohibits any person from transacting any business of insurance with a non-admitted insurer, unless the insurance complies with California's surplus lines laws. Plaintiffs contend that the precertification contracts entered into by PHN and CareAmerica with the nonadmitted insurers or their third-party administrator agents violated Insurance Code § 1761 and were therefore illegal.
However, the statutory provision plaintiffs cite applies only to insurance brokers who "place" insurance, and is thus inapplicable to the precertifiers. Section 1761 states:
§ 1761. Placing insurance with nonadmitted insurer
Except as provided in Sections 1760 and 1760.5, a person within this State shall not transact any insurance on property located or operations conducted within, or on the lives or persons of residents of this State with nonadmitted insurers, except by and through a surplus line broker licensed under this chapter and upon the terms and conditions prescribed in this chapter.
As indicated by its heading, the provision applies only to those who "place insurance" and that does not include the precertifier defendants. Plaintiffs' negligence per se theory thus fails.

The Aiding and Abetting Claims
Plaintiffs seek to impose liability on the precertifier defendants on a theory of aiding and abetting fraud and breach of fiduciary duty. Plaintiffs contend that defendants' precertifications constituted "implied representation[s] of the existence of real and legal insurance which gave substantial assistance to the persons selling and operating the illegal and phony insurance." Plaintiffs' Br. at 3.
Defendants contest the viability of the aiding and abetting theory on the ground that plaintiffs have conceded that the precertifier defendants did not have actual knowledge of the underlying fraudulent scheme, and that aiding and abetting liability cannot be imposed absent actual knowledge of the underlying tort. Plaintiffs respond that actual knowledge is not a prerequisite to liability for aiding and abetting torts. While plaintiffs concede that the precertifier defendants may not have had actual knowledge of the underlying infirmity of the insurance, they contend that PHN and CareAmerica should have known that the insurers were fraudulent and breaching a fiduciary duty owed to plaintiffs. Plaintiffs allege that a telephone call to the California Department of Insurance or a cursory review of the claims history of this bloc of business would have established that the insurers for whom they were working were non-admitted and fraudulent.
It is clear that liability for aiding and abetting a tort cannot attach absent actual knowledge of the underlying tort. The Restatement (Second) of Torts, § 876 states:
For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
(a) does a tortious act in concert with the other or pursuant to a common design with him, or
(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.
(emphasis added). The Restatement's requirement of "knowledge" has been widely *843 adopted. The Supreme Court in its recent decision, Central Bank, N.A. v. First Interstate Bank, N.A., ___ U.S. ___, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), cited it in discussing the knowledge/intent requirement for aiding and abetting generally:
The Restatement of Torts, under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting. An actor is liable for harm resulting to a third person from the tortious conduct of another "if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other...." Restatement (Second) of Torts § 876(b) (1977).
Id. at ___, 114 S.Ct. at 1450. The leading California cases on the issue of aiding and abetting also appear to follow the Restatement's requirement that actual knowledge must be demonstrated. See Sindell v. Abbott Laboratories, 85 Cal.App.3d 1, 149 Cal.Rptr. 138, 143 (Cal.Dist.Ct.App.1978); Coffman v. Kennedy, 74 Cal.App.3d 28, 141 Cal.Rptr. 267, 269 (Cal.Dist.Ct.App.1977). So too do the cases from this district. In Terrydale Liquidating Trust v. Barness, 611 F.Supp. 1006 (S.D.N.Y.1984), District Judge Sand dismissed claims for aiding and abetting breach of fiduciary duty because defendants lacked actual knowledge of the primary wrongdoing. He wrote:
In order to sustain a claim of aiding and abetting, plaintiff must demonstrate evidence of [the alleged aider and abettor's] knowledge of wrongdoing by the [primary wrongdoer]. Actual knowledge of a breach of duty is required; mere suspicion or even recklessness as to the existence of a breach is insufficient.... The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one. Especially where the alleged aider and abettor owes no fiduciary duty to, or has no confidential relationship with, the injured party, ... liability cannot be imposed absent a showing that the defendants had actual knowledge of tortious conduct by the primary wrongdoer.
Id. at 1027.
In the instant case, plaintiffs concede that defendants acted "unknowingly" in aiding and abetting the perpetrators of the fraud. Unger Aff. at Ex. C. This concession precludes them from pursuing aiding and abetting claims against PHN and CareAmerica.

III. Conclusion
Defendants PHN's and CareAmerica's motions for summary judgment are hereby granted, and judgment may be entered on their behalf since there is no reason for delay. Fed.R.Civ.P. 54(b).
So Ordered.
NOTES
[1] In the Second Amended Complaint, plaintiffs allege claims against PHN and CareAmerica for breach of fiduciary duty and under ERISA. In their motion papers and in their representations to the court, however, it appears that plaintiffs have addressed only three theories of liability, negligence, negligence per se, and aiding and abetting, and have conceded the other theories of liability against these two defendants.
[2] Defendant CareAmerica moves the Court for summary judgment pursuant to Fed.R.Civ.P. 56; Defendant PHN moves the Court for an order pursuant to Fed.R.Civ.P. 12(c) or, in the alternative, Fed.R.Civ.P. 56, dismissing all claims against PHN in this action. Essentially, both seek the same relief on the same grounds: that plaintiffs' claims against them fail as a matter of law on the issue of liability. The Court elects to treat both motions as motions for summary judgment pursuant to Fed.R.Civ.P. 56.